# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Briar Hill Foods, LLC, *et al.*[1] | ) | Case No. 17-61892 |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | Judge Russ Kendig |

## MOTION TO (I) EXCUSE RECEIVER'S COMPLIANCE WITH TURNOVER PROVISIONS OF 11 U.S.C. § 543; (II) AUTHORIZE RECEIVER TO REMAIN IN POSSESSION PURSUANT TO 11 U.S.C. § 543(d); (III) APPROVING RECEIVER COMPENSATION; AND (IV) AUTHORIZING RECEIVER TO MAINTAIN EXISTING RECEIVERSHIP ACCOUNT

Briar Hill Foods, LLC, Bias Realty, Ltd., Jack Coffy, LLC, Thorne Management, Inc. and CPW Properties, Ltd. (each a "Debtor" and collectively, the "Debtors"), the debtors and debtors-in-possession in the above-captioned Chapter 11 case, hereby move (the "Motion") move this Court for entry of an Order: (i) pursuant to § 543(d)(1), excusing the receiver's compliance with §§ 543(a), (b), and (ii) because the interests of Debtors' creditors and the estate would be better served by permitting the receiver to continue to possess, control and manage property currently under the receiver's control; (iii) authorizing the Receiver to be compensated as set forth herein; (iv) authorizing the Receiver to maintain the Receivership Account; and (v) granting such other and further relief as this Court deems necessary.

## PRELIMINARY STATEMENT

As discussed more fully herein, Debtors' operations generally fall into one of two categories: (1) retail grocery operations; and (2) real estate holding companies owning the real property upon which the grocery operations (and other tenants) are located. The retail grocery

---

[1] The Debtors are Briar Hill Foods, LLC, EIN: 34-1382213, case no. 17-61892; Bias Realty, Ltd., EIN: 34-1809039, case no. 17-61893; Jack Coffy, LLC, EIN: 34-1624101, case no. 17-61894; CPW Properties, Ltd., EIN: 34-1809040; case no. 17-61895; and Thorne Management, Inc., EIN: 34-1334543, case no. 17-61896.

operations are no longer conducting business and the Debtors no longer have any employees or management. While the real estate holding companies in some instances continue to collect rent from other tenants, the real estate is in foreclosure and, as described below, is being managed by a state court-appointed receiver tasked with selling the various properties and assets under its control.

Prior to the Debtors' bankruptcy filing, the Receiver (defined below) was appointed to manage the Debtors' assets pending a sale. Pending a hearing on this Motion, the Receiver is acting under the authority of Section 543(a) to take such action as is necessary to preserve such property. It is appropriate to permit the Receiver, under this Court's supervision, to continue to act to possess, control and manage such property.

In support of this Motion, the Debtors state as follows:

## JURISDICTION AND VENUE

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and this district's general order of reference of July 16, 1984. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2. The venue of the Debtors' Chapter 11 case and this Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409 and Local Bankruptcy Rules.

## BACKGROUND

3. On August 25, 2017 (the "Petition Date"), Debtors filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

4. The Debtors are operating their businesses as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee, examiner, or official committee of unsecured creditors has been appointed.

### A. Summary of Capital Structure and Current Business Operations

5. Briar Hill Foods, LLC, ("Briar Hill") is a limited liability company formed under the laws of the State of Ohio and headquartered in Salem, Ohio. Briar Hill previously operated retail grocery stores in Northeast Ohio known as (a) Thorne's IGA, located at 653 S Union Ave, Alliance, Ohio (the "Alliance Store"); (b) Thorne's IGA Carrollton, located at 501 West Main St., Carrollton, Ohio (the "Carrollton Store"); and (c) Thorne's IGA, located at Unit 17 of College Plaza, Alliance, Ohio (the "College Store"). As discussed below, a receiver has been appointed over the assets of Briar Hill and the Alliance, Carrollton and College Stores have ceased operations.

6. Bias Realty, Ltd. ("Bias Realty") is a limited liability company formed under the laws of the State of Ohio and headquartered in Salem, Ohio. Bias Realty previously operated a retail grocery store and pharmacy known as Thorne's Jefferson Bi Lo, located at 344 South Chestnut Street, Jefferson, Ohio (the "Bias Store"). As discussed below, a receiver has been appointed over the assets of Bias Realty and the Bias Store has ceased operations.

7. Jack Coffy, LLC ("Coffy") is a limited liability company formed under the laws of the State of Ohio and headquartered in Salem, Ohio. Coffy previously operated a retail grocery store known as Coffy's Supermarket, located at 264 South Main Street, Cadiz, Ohio (the "Coffy Store"). As discussed below, a receiver has been appointed over the assets of Coffy and the Coffy store has ceased operations.

8. CPW Properties, Ltd. ("CPW") is a real estate holding company that owns certain real property leased by affiliate Debtors in connection with the Alliance Store, Carrollton Store, Bias Store, and Coffy Store. As discussed below, a receiver has been appointed over the assets and properties of CPW.

9. Thorne Management, Inc. ("Thorne Management") is a real estate holding and management company that owns the main office of the Debtors and certain non-debtor affiliates. Thorne Management also leases its commercial real property space to certain other tenants. As discussed below, a receiver has been appointed over the assets and properties of Thorne Management.

10. The stocks or shares, as the case may be, of Briar Hill, Bias Realty, and Coffy are owned or controlled by The Thorne Group, LLC ("Thorne Group"). Thorne Group is a holding company whose shares or units are owned by Debtor Thorne Management and non-debtors (a) Briar Hill Holdings, LLC, (b) Jack Coffy Holdings, LLC, (c) the William T. Thorne Revocable Trust (the "Thorne Trust"), (d) the Pamela T. Wagner Revocable Trust (the "Wagner Trust"), and (e) the Cindy L. Wine Revocable Trust (the "Wine Trust" and together with the Thorne Trust and the Wagner Trust, the "Trusts"). The Trusts each also own 1/3 of the shares of CPW and Thorne Management.

### B. Prepetition Debt Structure

#### i. *Prepetition Obligations to Huntington*

11. On November 30, 2012 the Debtors and certain non-debtor entities, The Bias Group Enterprises, LLC, The Thorne Group, LLC, Thorne Foods of Pennsylvania, LLC, Thorne Foods, Inc. and Thorne Foods, Inc. – Jefferson (collectively, the "Non-Debtor Borrowers" and together with the Debtors, the "Borrowers") entered into that certain Business Loan Agreement with Huntington. In connection therewith, on November 30, 2012, the following agreements and documents were entered into with, or executed in favor of, Huntington:

   a. Promissory Notes executed by the Borrowers:

      i. Promissory Revolving Note in the original principal amount of $500,000 (the "Line of Credit") with a maturity date of November 30, 2013;

4

ii. Promissory Term Note in the original principal amount of $1,492,730.18 ("Term Note 1") with a maturity date of December 5, 2015;

iii. Promissory Term Note in the original principal amount of $525,748 ("Term Note 2") with a maturity date of December 5, 2015; and

iv. Promissory Term Note in the original principal amount of $8,650,735.47 ("Term Note 3" and together with Line of Credit, Term Note 1 and Term Note 2, the "Notes") with a maturity date of December 5, 2015.

b. Commercial Guaranties executed by the following parties (collectively, the "Non-Debtor Guarantors" and together with the Borrowers, the "Obligors"):

i. Cynthia Thorne-Wine, with an exposure limit of $187,500;

ii. Pamela Thorne-Wagner, with an exposure limit of $187,500;

iii. Theodore F. Thorne, with an exposure limit of $187,500;

iv. William T. Thorne, with an exposure limit of $187,500;

v. Briar Hill Holdings, LLC;

vi. Jack Coffy Holdings, LLC; and

vii. Seneca Real Estate Group, LLC.

c. Open-End Mortgages and Assignments of Rent securing the amount of $11,169,213.65 executed by CPW and Thorne Management, encumbering the following real property:

i. 653 South Union Avenue, 623-634 Scranton Avenue, and 652-654 Scranton Avenue, Alliance, Stark County, Ohio 44601 (collectively, the "Stark Properties") (owned by CPW);

ii. 264 South Main Street, Cadiz, Harrison County, Ohio 43907 (the "Harrison Property") (owned by CPW);

iii. 475 West Main St., Carrollton, Ohio 44615; 351 West Main St., Carrollton, Ohio 44615; Lot 5 in Pierson's Addition to Village of Carrollton; 501 West Main St., Carrollton, Ohio 44615; 517 West Main St., Carrollton, Ohio 44615; 367 West Main St., Carrollton, Ohio 44615; and 525 West Main St., Carrollton, Ohio 44615 (collectively, the "Carrollton Properties") (owned by CPW);

iv. 57 East Mulberry Street, Jefferson, Ohio 44047; 51 East Mulberry Street, Jefferson, Ohio 44047; East Cedar Street, Jefferson, Ohio

5

44047; 344 South Elm Street, Jefferson, Ohio 44047; 344 South Chestnut Street, Jefferson, Ohio 44047; and 59 East Mulberry Street, Jefferson, Ohio 44047 (collectively, the "Ashtabula Properties") (owned by CPW); and

v. 1434-1466 Franklin Avenue, Salem, Ohio 44460 (the "Columbiana Property") (owned by Thorne Management).

d. Commercial Security Agreement executed by the Borrowers and certain of the Non-Debtor Guarantors whereby the Borrowers and those certain Non-Debtor Guarantors granted a security interest to Huntington in and to substantially all of their personal property assets (the "Huntington Lien").

e. ISDA Master Agreement entered into by the Borrowers.

f. Cross Default and Collateralization Agreement entered into by the Borrowers and the Non-Debtor Guarantors.

12. In December 2013, after Huntington declared a default under the Business Loan Agreement, Huntington and the Obligors entered into that certain Forbearance Agreement whereby the Obligors released Huntington from any and all claims and Huntington agreed to forbear and defer from executing its rights and remedies against the Obligors during the forbearance period. Huntington and the Obligors entered into various modifications and addendums to the Forbearance Agreement, the most recent being that certain Sixth Addendum to Forbearance and Modification Agreement dated June 29, 2016 (collectively, the "Forbearance Agreement").

13. As of June 29, 2016, all of the Notes, other than Term Note 3, were paid in full by the Borrowers. As of August 25, 2017, the outstanding unpaid principal balance of Term Note 3 was approximately $2,508,085.12.

14. During the receivership (as discussed below) Huntington advanced not less than $189,024.06 to the Receiver to manage the Receivership Property (as defined below). As of the Petition Date, approximately $71,064.71 is remaining under the advance (the "Advance").

6

### ii. Prepetition Obligations to C&S

15. On June 23, 2011, Briar Hill, Bias Realty, Coffy and certain other non-Debtor affiliates (the "C&S Borrowers") and C&S Wholesale Grocers, Inc. ("C&S") entered into that certain Supply Agreement (the "Supply Agreement"). On June 23, 2011, the C&S Borrowers and C&S entered into that certain Amended and Restated Security Agreement (the "Security Agreement"). Pursuant to the Security Agreement, the C&S Borrowers granted a security interest to C&S in and to substantially of their personal assets (the "C&S Lien") to secure any obligations incurred by the C&S Borrowers to C&S (the "C&S Obligations"), including those obligations incurred pursuant to the Supply Agreement.

### iii. Subordination

16. On November 30, 2012, Huntington and C&S entered into that certain Subordination Agreement (the "C&S Subordination Agreement"). As set forth in the Subordination Agreement, Huntington and C&S agreed that C&S's security interests would have superior priority on the personal property assets of Coffy and Bias Realty. With respect to the assets of the remaining Debtors, the Non-Debtor Borrowers and the Non-Debtor Guarantors, C&S subordinated the C&S Lien to the Huntington Lien.

**C. The Receivership Actions**

**i. The Stark County foreclosure action.**

17. On March 10, 2017, Huntington commenced a foreclosure action against the Debtors in the Stark County Court of Common Pleas (the "Stark Foreclosure Action"). In the Stark Foreclosure Action, Huntington sought to foreclose on certain real and personal property owned by Debtors.

18. On April 27, 2017, an agreed order appointing a receiver was entered in the Stark Foreclosure Action (the "Stark Receivership Order"). The Stark Receivership Order appointed

exSELLit Receiver, LLC (the "Receiver") to take possession of, manage, control, protect, and sell: (1) the following real property owned by CPW: (a) 653 South Union Avenue, Alliance, Ohio 44601; (b) 632-634 Scranton Avenue, Alliance, Ohio 44601; and (c) 652-654 Scranton Avenue, Alliance, Ohio 44601 (the "Stark Properties"); and (2) all rents, leases, and other personal property or assets that in any way related to the Stark Properties and owned by the Debtors (collectively the "Stark Receivership Property").

19. A true and accurate copy of the Stark Receivership Order is attached hereto as Exhibit 1.

### ii. The Carroll County foreclosure action.

20. On May 18, 2017, Huntington commenced a foreclosure action against the Debtors in the Carroll County Court of Common Pleas (the "Carroll Foreclosure Action").

21. Also on May 18, 2017, an agreed order appointing a receiver was entered in the Carroll Foreclosure Action (the "Carroll Receivership Order"). The Carroll Receivership Order appointed the Receiver to take possession of, manage, control, protect, and sell: (1) the following real property owned by CPW: (a) 475 West Main St., Carrollton, Ohio 44615; (b) 351 West Main St., Carrollton, Ohio 44615; (c) Lot 5 in Pierson's Addition to Village of Carrollton; (d) 501 West Main St., Carrollton, Ohio 44615; (e) 517 West Main St., Carrollton, Ohio 44615; (f) 367 West Main St., Carrollton, Ohio 44615; and (g) 525 West Main St., Carrollton, Ohio 44615 (the "Carrollton Properties"); and (2) all rents, leases, and other personal property or assets that in any way related to the Carrollton Properties and owned by the Debtors (collectively the "Carroll Receivership Property").

22. A true and accurate copy of the Carroll Receivership Order is attached hereto as Exhibit 2.

### iii. The Columbiana County foreclosure action.

23. On May 18, 2017, Huntington commenced a foreclosure action against the Debtors in the Columbiana County Court of Common Pleas (the "Columbiana Foreclosure Action").

24. On May 19, 2017, an agreed order appointing a receiver was entered in the Columbiana Foreclosure Action (the "Columbiana Receivership Order"). The Columbiana Receivership Order appointed the Receiver to take possession of, manage, control, protect, and sell: (1) 1440 Franklin Avenue, Salem, Ohio owned by Thorne Management, Inc. (the "Columbiana Property"); and (2) all rents, leases, and other personal property or assets that in any way relate to the Columbiana Property and owned by the Debtors (collectively the "Columbiana Receivership Property").

25. A true and accurate copy of the Columbiana Receivership Order is attached hereto as Exhibit 3.

### iv. The Harrison County foreclosure action.

26. On May 19, 2017, Huntington commenced a foreclosure action against the Debtors in the Harrison County Court of Common Pleas (the "Harrison Foreclosure Action").

27. On May 23, 2017, an agreed order appointing a receiver was entered in the Harrison Foreclosure Action (the "Harrison Receivership Order"). The Harrison Receivership Order appointed the Receiver to take possession of, manage, control, protect, and sell: (1) 264 South Main Street, Cadiz, Ohio 43907 owned by CPW (the "Harrison Property"); and (2) all rents, leases, and other personal property or assets that in any way related to the Harrison Property and owned by the Debtors (collectively the "Harrison Receivership Property").

28. A true and accurate copy of the Harrison Receivership Order is attached hereto as Exhibit 4.

### v. The Ashtabula County foreclosure action.

29. On May 22, 2017, Huntington commenced a foreclosure action against the Debtors in the Ashtabula County Court of Common Pleas (the "Ashtabula Foreclosure Action" and together with the Stark Foreclosure Action, the Carrollton Foreclosure Action, the Columbiana Foreclosure Action, and the Harrison Foreclosure Action, the "Foreclosure Actions").

30. On May 26, 2017, an agreed order appointing a receiver was entered in the Ashtabula Foreclosure Action (the "Ashtabula Receivership Order" and, collectively with the Stark, Carroll, Columbiana and Harrison Receivership Orders, the "Receivership Orders"). The Ashtabula Receivership Order appointed the Receiver to take possession of, manage, control, protect, and sell: (1) the following real property owned by CPW: (a) 57 East Mulberry Street, Jefferson, Ohio 44047; (b) 51 East Mulberry Street, Jefferson, Ohio 44047; (c) East Cedar Street, Jefferson, Ohio 44047; (d) 344 South Elm Street, Jefferson, Ohio 44047; (e) 344 South Chestnut Street, Jefferson, Ohio 44047; and (f) 59 East Mulberry Street, Jefferson, Ohio 44047 (the "Ashtabula Properties"); and (2) all rents, leases, and other personal property or assets that in any way relate to the Harrison Property and owned by the Debtors (collectively the "Ashtabula Receivership Property" and, collectively with the Stark, Carroll, Columbiana and Harrison Properties, the "Receivership Property").

31. A true and accurate copy of the Ashtabula Receivership Order is attached hereto as Exhibit 5.

### vi. The Receivership Orders and actions taken by the Receiver.

32. Pursuant to the Receivership Orders, the Receiver was authorized to have exclusive possession, control and custody of the Receivership Property and was generally

authorized to take all actions necessary to properly and adequately manage, control, operate, maintain, and protect the Receivership Property during the Foreclosure Actions.

33. Since its appointment in the Foreclosure Actions, the Receiver has made substantial progress in marketing and negotiating the sale of the Receivership Property. Certain inventory sales closed prior to the Petition Date and the Receiver anticipates finalizing a stalking horse asset purchase agreement for the Debtors' assets and real estate in the coming days.

34. In addition to spearheading the sale negotiations, since being appointed in the Foreclosure Actions the Receiver has taken additional actions in furtherance of the management, care and protection of the Receivership Property, including, but not limited to:

(a) Participating in the transition of the management of the Receivership Property from prior management to the Receiver;

(b) Reviewing and updating the Debtors' books and records to the extent necessary;

(c) Preparing and filing reports of receivership activities in the Foreclosure Actions;

(d) Collecting rents and attending to the needs of tenants that continue to conduct business on the real property; and

(e) Managing the Debtors' affairs as required by the Receivership Orders.

**D.    Events Leading To The Filing Of These Chapter 11 Cases**

35. Other than Thorne Management, which continues to lease property to commercial tenants, the Debtors have ceased operations. All of the Debtors' properties are subject to the Receivership Orders.

36. Since its appointment in the Foreclosure Actions, the Receiver has made substantial progress in marketing and negotiating the sale of the Receivership Property. The

Receiver anticipates finalizing a stalking horse asset purchase agreement for the Debtors' assets and real estate in the coming days. Given the fact that there are five separate receivership actions, issues with utility providers that can be avoided under the Bankruptcy Code and potential unfunded pension liability issues, Huntington and the Debtors (in consultation with the anticipated stalking horse purchaser) have determined that a sale of the Debtors' assets is more appropriately conducted under the ambit of the Bankruptcy Court. However, removing the Receiver from these negotiations and imminent sales will impede the orderly sale of these properties and may jeopardize them altogether, to the detriment of Debtors' creditors and estates.

**RELIEF REQUESTED**

**Excusing Compliance with Section 543(d)(1)**

37. The Debtors submit that their estates and creditors will be served by permitting the Receiver to continue its control and management of the Receivership Property, and to continue to negotiate the sale of certain Receivership Property in furtherance of those interests. Removing the Receiver from these negotiations and imminent sale will impede the orderly sale of these properties and may jeopardize them altogether, to the detriment of Debtors' creditors and the bankruptcy estate itself.

38. To this end, the Debtors respectfully request that the Court enter an order: (i) pursuant to Section 543(d)(1), excusing compliance with Sections 543(a), (b), and (c) because the interests of the Debtors' creditors and the estate are better served by permitting the Receiver to continue to possess, control and manage the Receivership Property under the jurisdiction of this Court; (ii) authorizing the Receiver to be compensated as set forth below; (iii) authorizing the Receiver to maintain the existing Receivership Account (as defined below); and (iv) granting such other and further relief which is necessary to carry out the purpose of this Motion.

39. While § 543 generally requires a custodian, such as a receiver, to turn over property of the debtor upon commencement of a bankruptcy, Section 543(d)(1) authorizes the Court to excuse compliance with § 543 if the interests of creditors would be better served by permitting a receiver to continue in possession. *See* 11 U.S.C. § 543(d)(1); *In re LCL Income Properties*, 177 B.R. 872, 874 (Bankr. S.D. Ohio 1995); *In re Poplar Springs Apartments of Atlanta, Ltd.*, 103 B.R. 146, 149 (Bankr. S.D. Ohio 1989). "[S]ubsection (d) is an abstention policy which permits the custodianship to continue if the best interest of creditors and stockholders is served . . . ." *In re Sundance Corp.*, 83 B.R. 746, 747 (Bankr. D. Mont. 1988). *See also In re WPAS*, 6 B.R. 40, 43 (Bankr. M.D. Fla. 1980).

40. As set forth herein, it is in the best interests of all creditors in this case for this Court to excuse the Receiver from complying with the turnover provisions of 11 U.S.C. § 543(b) and to authorize the Receiver to retain control and continue to operate the Receivership Property pursuant to 11 U.S.C. § 543(d). The Debtors are not seeking to allow the Receiver to operate under the existing Receivership Orders or under the jurisdiction of the state courts. Rather, the Debtors seek approval only for the Receiver to maintain possession, control and operation of the Receivership Property under the jurisdiction of this Court and in accordance with the provisions of the Bankruptcy Code.

41. The Debtors have had no management or employees since the inception of the Foreclosure Actions. The Receiver is the only entity with the knowledge and ability to assist with the limited operations and maintenance of the Foreclosure Properties pending a sale. William Thorne, the Debtors' president, no longer resides in the Ohio and has not had any role in operating the Debtors' businesses in several months. Removing the Receiver from its current duties will impact, delay, impair, and jeopardize the ongoing negotiations relating to the sale of the Debtors' properties. Accordingly, it is in the best interests of the Debtors' creditors, and the

bankruptcy estate to allow the Receiver to retain control and continue to operate the Receivership Properties pending a sale.

43. Additionally, the Debtors are not aware of any creditor or interested party that would be unfairly impacted if the relief requested herein is granted. A sale of the Receivership Property is the only way for the estates to generate proceeds for distribution to creditors. As discussed above, however, a sale process would be more appropriately handled in this Court.

## Approving Compensation of Receiver

43. The Receivership Orders provide for the Receiver to be compensated at the rate of $200.00 per hour, and for other professionals and support staff to be compensated at rates of $125-$150 per hour, plus expenses. Additionally, under the Receivership Orders, the Receiver is entitled to a commission in an amount equal to six percent (6%) of the full purchase price of any part of the Receivership Property which the Receiver or Huntington brings to sale. The Receiver and Huntington have agreed that, as compensation for its services during the chapter 11 cases, the Receiver will receive a commission equal to 3% of the purchase price for any sale of Receivership Property approved by this Court, and an additional 3% commission in the event that Huntington's Prepetition Indebtedness (including the Advance and all principal, interest and attorney's fees) is paid in full. The Receiver will keep hourly records of its time and an application will be submitted to the Court to be heard after closing of a sale.

## Maintenance of Existing Receivership Bank Account

44. The Office of the United States Trustee has established certain operating guidelines for debtors-in-possession in order to supervise the administration of Chapter 11 cases. These guidelines require Chapter 11 debtors to, *inter alia,* (a) close all existing bank accounts and open new debtor-in-possession bank accounts, (b) establish one debtor-in-possession account for all estate monies required for the payment of taxes, including payroll taxes, (c)

14

maintain a separate debtor-in-possession account for cash collateral, and (d) obtain checks for all debtor-in-possession accounts which bear the designation "Debtor-In-Possession", the bankruptcy case number, and the type of account. These requirements are designed to provide a clear line of demarcation between prepetition and postpetition transactions and operations, and prevent the inadvertent postpetition payment of prepetition claims.

45. In the event that the Court grants the relief requested herein, the Debtors request that the Court authorize the Receiver to maintain its existing and designated account for the Debtors. Prior the commencement of the case, the Receiver maintained one general operating checking account for all of the Receivership Actions at Huntington Bank (the "<u>Receivership Account</u>"). Any income paid into any of the Debtors was deposited into and any payables generated were deducted out of the Receivership Account. While the Receivership Account is a general operating account servicing each of the Debtor entities, the Receiver maintains detailed records of each Debtor's respective income and expenses and is able to account for and segregate such funds if needed. There are no real operations at this point and, accordingly, the vast majority of the banking activity is borne by the Debtors holding the real property. Given the very limited volume of banking transactions, the Debtors submit that maintaining one integrated account is feasible and appropriate. Further, the Receivership Account is maintained at Huntington, which has a depository agreement with the Office of the United States Trustee. Accordingly, the Debtor respectfully requests that the Court waive the aforementioned requirements of the United States Trustee's "Operating Guidelines and Financial Reporting Requirements Required in All Cases Under Chapter 11" and authorize the Receiver to maintain the Receivership Account.

## **Conclusion**

WHEREFORE, the Debtors respectfully request that the Court enter an Order: (i) excusing the Receiver from complying with 11 U.S.C. § 543; (ii) authorizing the Receiver to remain in possession of the Receivership Property pursuant to 11 U.S.C. § 543(d); (iii) authorizing the Receiver to be compensated as set forth herein; (iv) authorizing the Receiver to maintain the Receivership Account; and (v) for such other and further relief as is necessary to carry out the purpose of this Motion.

Respectfully submitted,

/s/ *Kate M. Bradley*
Marc B. Merklin (0018195)
mmerklin@brouse.com
Kate M. Bradley (0074206)
kbradley@brouse.com
Bridget A. Franklin (0083987)
bfranklin@brouse.com
Brouse McDowell, LPA
388 S. Main Street, Suite 500
Akron, Ohio 44311
Telephone: (330) 535-5711
Facsimile: (330) 253-8601

*Proposed Counsel for the Debtors and Debtors-in-Possession*

1003746

16

17-61892-rk    Doc 32    FILED 09/06/17    ENTERED 09/06/17 16:57:07    Page 16 of 16